UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED

JAN 1 2 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

RICHARD J. HAMM, JR.,                    )
                                         )
             Plaintiff,                  )
                                         )
v.                                       )        1:14-cv-00038 (IDD)
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
             Defendant.                  )
_____)

### MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 12, 14). Pursuant to 42 U.S.C. § 405(g), Richard J. Hamm, Jr. ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-434. For the reasons stated below, the Court finds that Defendant's decision is supported by substantial evidence, and that there is no evidence warranting remand. Accordingly, the Court GRANTS summary judgment for Defendant and DENIES summary judgment for Plaintiff.

### I.        PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on March 27, 2006, alleging disability since September 2, 2004 due to various impairments of the lumbar spine, including "degenerative disc disease" and "lumbar radiculopathy." (Administrative Record ("R.") 111, 197.) Plaintiff last met the insured status requirements of the Act ("date last insured") on December 31, 2009. (*Id.* at 488.) Plaintiff's initial claim was denied on July 11, 2006 and again upon reconsideration on

November 2, 2006. (*Id.* at 114, 118.) Plaintiff requested a hearing in front of an Administrative Law Judge ("ALJ") on December 29, 2006. (*Id.* at 121.) Hearings before ALJ Martha Bower were conducted on January 9, 2008 and July 23, 2008. (*Id.* at 72, 19.)

On July 25, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (*Id.* at 9-18.) On March 22, 2010, the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Plaintiff's request for review of the ALJ's decision. (*Id.* at 1-4.) Plaintiff then appealed to the United States District Court for the District of Massachusetts. (Dkt. No. 13 at 1.) On April 11, 2012 and June 1, 2012, the District Court entered orders remanding the case to the Social Security Administration ("SSA"), with instructions to update the record and assign a new ALJ to hear the case *de novo*. (R. 537-38.)

ALJ C.J. Sturek held this hearing on November 30, 2012. (*Id.* at 499.) On January 22, 2013, the ALJ issued his decision finding Plaintiff was not disabled from September 2, 2004, his alleged onset date, through December 31, 2009, his date last insured. (*Id.* at 495.) On December 12, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g). (*Id.* at 469-70.) Having exhausted his administrative remedies, Plaintiff filed the instant suit challenging the ALJ's decision on January 15, 2014. (Dkt. No. 1.) Cross-motions for summary judgment were filed and this matter is ripe for disposition.

## II.       FACTUAL BACKGROUND

Plaintiff was born on November 6, 1974 and was 29 years old at his alleged onset date, September 2, 2004. (R. 493.) He has a high school education, and previously worked as a fish/deli clerk, print shop helper, stock puller, warehouse worker, and receiving supervisor. (*Id.* at 184, 493.) In various disability reports filed with the SSA in 2006, Plaintiff stated he could

drive short distances around his home, perform some household chores, socialize, and run local errands. (*Id.* at 211-14.) He could make simple meals, vacuum for short periods, and shop for some groceries once or twice a week. (*Id.* at 212.) Plaintiff reported that he was able to care for his own personal needs without assistance. (*Id.* at 211.) He could watch television, attend hockey games once or twice per month, and attend regular outings such as cookouts with family and friends. (*Id.* at 213.) Plaintiff later reported erratic sleep because of progressive hip and left leg pain, and difficulty climbing stairs, getting dressed, and getting in and out of the shower. (*Id.* at 236.)

### A. Medical Evidence

#### 1. Lumbar Spine and Hip

On May 3, 2003, Plaintiff was admitted to Beth Israel Deaconess Medical Center in Boston, Massachusetts after falling out of the rear door of a bus. (R. 247.) He was treated for minor injuries associated with the accident and discharged with instructions to follow up with his primary care physician. (*Id.* at 254, 256-57.) On December 19, 2003, Plaintiff was examined by Kevin N. Mabie, M.D., an orthopedic surgeon, complaining of progressive pain in his back and buttock, extending down the left leg and foot. (*Id.* at 262.) An MRI of his lumbar spine indicated a loss of L5-S1 disc space consistent with disc degeneration, and a left-sided disc protrusion at L5-S1 touching the left S1 nerve root and left L5 nerve root ganglion. (*Id.* at 262-63.) As a result, Dr. Mabie suggested Plaintiff undergo a neurosurgical evaluation. (*Id.* at 262.)

On January 9, 2004, neurosurgeon Leslie Stern, M.D. examined Plaintiff. (*Id.* at 352.) She diagnosed disc herniation at L5-S1 with compromise of the neuroforamen, and L5 and S1 nerve root impingement. (*Id.* at 352-53.) Plaintiff reported taking Vicodin for pain. (*Id.* at 352.) In order to help alleviate his pain symptoms, Dr. Stern performed a minimally-invasive

microdiscectomy with microdissection and decompression on January 22, 2004. (*Id.* at 265-66.) During the procedure, "a considerable amount of degenerative change" was observed at the L5-S1 level. (*Id.* at 371.) The procedure initially improved Plaintiff's left leg pain; however, the relief was incomplete, as Plaintiff reported experiencing back and knee-to-ankle pain after doing some lifting at work. (*Id.* at 356-57, 361-62.) Plaintiff stopped working in September 2004, and reported to Dr. Stern that he was taking one to three Percocet per day, a muscle relaxant, and an anti-inflammatory. (*Id.* at 361.)

An MRI from November 9, 2004 again revealed significant protrusion of Plaintiff's L5-S1 left foraminal disc and an associated disc bulge with nerve root impingement. (*Id.* at 346.) Dr. Stern diagnosed "S1 radiculopathy left due to degenerative disc disease" and performed a second L5-S1 microdiscectomy and decompression on March 15, 2005. (*Id.* at 347.) In follow-ups with Dr. Stern on April 20, 2005 and November 23, 2005, Plaintiff reported "quite good relief" in his left leg, despite some ongoing back and hip pain. (*Id.* at 367-68.) Dr. Stern advised Plaintiff that he would have "some back pain through the years, but usually not severe" and encouraged him to gradually increase his activity. (*Id.* at 367.) On examination, Dr. Stern observed Plaintiff favoring his left leg, but noted bilateral paraspinal muscle spasm with a normal spinal curvature, no scoliosis, and forward flexion to 60 degrees with "quite good reversal." (*Id.* at 368.) Plaintiff had hip and groin pain with most hip maneuvers, a straight-leg raise test was only 30 degrees bilaterally, and the left ankle jerk was absent. (*Id.*) Dr. Stern ordered bilateral hip X-rays, which indicated narrowing of the hip joint spaces and hypertrophic changes consistent with degenerative joint disease. (*Id.* at 369, 381.)

On March 14, 2006, Plaintiff was examined by his primary care physician, Brad Kney, M.D., who observed severely reduced range of motion in Plaintiff's left hip and pain on rotation.

(*Id.* at 381.) Dr. Kney opined that Plaintiff was unable to work due to his symptoms and might need a left total hip replacement. (*Id.*) Dr. Kney later refilled Plaintiff's prescription for Percocet at four pills per day. (*Id.* at 452.) On October 25, 2006, an MRI of Plaintiff's left hip showed possible femoroacetabular impingement and bilateral osteophytosis of the acetabulae. (*Id.* at 423.) On February 12, 2007, a CT scan also revealed deformity of the femoral necks. (*Id.* at 441.)

On March 21, 2007, Dr. Mabie performed a total left hip replacement to address Plaintiff's severe left hip osteoarthritis. (*Id.* at 428, 453.) Post-surgery, Plaintiff was able to walk well and move his hip without difficulty or pain. (*Id.* at 443-44.) Although he initially used crutches, on April 25, 2007 Dr. Mabie encouraged him to use just one crutch or a cane and continue physical therapy. (*Id.* at 444.) During follow-ups with Dr. Mabie and Dr. Kney, Plaintiff reported pain in his lower back, left knee and thigh, and some burning at the location of his prior back surgery. (*Id.* at 447, 459, 461.) Because his June 27, 2007 physical exam showed no effusion and a full range of motion, Dr. Mabie suspected the pain was due to localized aggravation as Plaintiff adjusted to a more normal gait pattern. (*Id.* 447-48.) Dr. Mabie also advised Plaintiff that Percocet was no longer necessary for his hip, and an over-the-counter analgesic would be more than adequate for his left knee symptoms. (*Id.* at 447.) An MRI of Plaintiff's knee taken July 9, 2007 "failed to demonstrate any abnormality." (*Id.* 448-50.) On December 21, 2007, Dr. Kney diagnosed lumbosacral strain, noting Plaintiff had no pain radiating into the leg, full range of motion of the left knee, and good range of motion in the hip, with a small amount of pain on examination. (*Id.* at 461.) A left hip X-ray showed Plaintiff's hip prosthesis was "anatomically aligned without loosening." (*Id.* at 461, 463.)

On October 7, 2008, Plaintiff returned to Dr. Kney complaining of lower back pain radiating to the left thigh and knee. (*Id.* at 588.) Dr. Kney's examination showed Plaintiff's sensation intact and the ability to heel and toe walk, pain to palpation over the lower lumbosacral spine, but a normal straight-leg raise test to approximately 80 degrees bilaterally (due to hamstring tightness). (*Id.* at 589.) Plaintiff had mild reduction in his right hip's range of motion and good range of motion in his left hip, both without pain. (*Id.*) A lumbar MRI taken October 17, 2008 indicated degenerative disc disease, central disc bulges at L4-L5 and L3-L4, and a cystic mass at the L5-S1 level. (*Id.* at 580-81.)

On December 3, 2008, John Chi, M.D., a neurosurgeon, examined Plaintiff and suggested nerve root block injections to alleviate his reported pain. (*Id.* at 593.) Dr. Chi observed that Plaintiff had a normal gait, could walk on his toes and heels without difficulty, and palpation and percussion of the spine produced little to no pain at any level. (*Id.* at 592.) Dr. Chi referred Plaintiff to BWH Pain Management Center, where he was examined by Sanjeet Narang, M.D. on March 2, 2009. (*Id.* at 594, 597.) Plaintiff reported taking Percocet for pain. (*Id.* at 597.) On examination, Plaintiff's straight-leg raise test was positive on the right side, with some loss of sensation in his left leg. (*Id.*) His reflexes were normal and there was no pain or tenderness over his hips. (*Id.*) Dr. Narang diagnosed Plaintiff with chronic pain and post-laminectomy syndrome, and recommended selective nerve root blocks and neuropathic pain medication. (*Id.* at 597-98.) Although Plaintiff underwent treatment with injections in March and April 2009, they did not completely alleviate his pain. (*Id.* at 601-04, 611.) Dr. Kney opined, on March 9, 2009, that he would gradually push Plaintiff's narcotics dosage higher, but "would favor non-narcotic methods of pain management." (*Id.* at 600.)

On October 13, 2009, Plaintiff commenced a trial of an electrical neurostimulator, which initially gave him "50-60% improvement." (*Id.* at 615.) A permanent spinal cord stimulator was implanted in Plaintiff's back on November 9, 2009. (*Id.* at 624.) On November 24, 2009, Dr. Narang reported that Plaintiff was doing well and that he had increased range of movement, despite still walking with a cane. (*Id.* at 621.) Dr. Kney also reported that Plaintiff's pain control was "adequate" and his activity was increasing. (*Id.* at 625.) On January 28, 2010, Dr. Narang observed Plaintiff standing upright and walking without a limp or favoring his left leg and side as in previous visits. (*Id.* at 626.) Plaintiff also reported going out more, increased exercise tolerance, and "marked improvement in his quality of life and his ability to carry on activities . . . ." (*Id.*)

Records from beyond the date last insured indicate that one of the electric leads in Plaintiff's stimulator migrated from its correct location, resulting in tingling, numbness, and pain in his left leg. (*Id.* at 627, 630, 634.) On May 20, 2010, Dr. Narang wrote that revision surgery would be needed. (*Id.* at 630.)

### 2. Irritable Bowel Syndrome

Plaintiff also testified to a history of irritable bowel syndrome ("IBS") since 1993, and Dr. Kney's treatment records indicate several "diarrhea NOS" diagnoses. (R. 533, 453-54, 459, 582.) On August 19, 2004, Plaintiff was admitted to the emergency room for chest pain and noted a history of IBS. (*Id.* at 341.) On December 18, 2006, Plaintiff reported experiencing two to three attacks of diarrhea per week with cramps. (*Id.* at 453.) These episodes responded to Imodium, (*id.* at 453-54), and Dr. Kney's opined that it was a "relatively minor problem." (*Id.*) On June 18, 2007, Plaintiff complained of a typical diarrhea pattern of three to five times per week. (*Id.* at 458.) On October 2, 2007, he reported two bowel movements per day, and Dr. Kney

opined that Plaintiff had IBS. (*Id.* at 459.) In a December 3, 2008 referral note, Dr. Kney wrote that Plaintiff averaged one to five bowel movements per day and took Imodium "on a fairly regular basis." (*Id.* at 595.) On July 20, 2009, Plaintiff reported fewer diarrhea attacks while on Percocet—about two per day. (*Id.* at 611.) In early 2010, he reported his episodes of cramps and diarrhea had reduced to one to two times per month. (*Id.* at 624.)

### 3. Adjustment Reaction

On June 1, 2006, Richard Ober, M.D. performed a consultative psychological examination for the Massachusetts Rehabilitation Commission's Disability Determination Services ("Massachusetts DDS"). (R. 391.) Dr. Ober diagnosed an adjustment reaction with depressed mood. (*Id.* at 394.) On July 7, 2009, Robert Newlin Jamison, Ph.D., interviewed Plaintiff in preparation for the spinal cord stimulator trial. (*Id.* at 610.) Dr. Jamison's impression included "psychosocial stressors." (*Id.*)

### B. Opinion Evidence

On January 23, 2006, Dr. Stern wrote a letter to Plaintiff's attorney describing her history treating Plaintiff from January 9, 2004 to November 23, 2005. (R. 370, 373.) Dr. Stern opined that Plaintiff suffered from lumbar radiculopathy, left; recurrent lumbar radiculopathy, left; and, degenerative disc disease of the lumbar spine. (*Id.* at 373.) She opined that bilateral X-rays of Plaintiff's hips demonstrated changes that might have accounted for some of his hip pain. (*Id.*) She also wrote that Plaintiff's prognosis "should be reasonably good, if [he] continue[d] to seek light work without excessive lifting or bending" and was restricted from stooping, crawling, or climbing to heights. (*Id.* at 374.) She felt he should be able to "sit, stand, [and] walk at will." (*Id.*)

On May 5, 2006, Dr. Kney wrote to Massachusetts DDS and reported diagnoses of "LS disc disease and bilateral hip osteoarthritis." (*Id.* at 381.) He opined that Plaintiff's range of motion in his left hip was severely reduced and that Plaintiff was unable to work due to the pain and limitations in mobility. (*Id.*) He opined that Plaintiff might require a left total hip replacement. (*Id.*) In a second letter to Massachusetts DDS, dated September 29, 2006, Dr. Kney reported that Plaintiff was incapable of returning to his work as a warehouse supervisor because of pain and reduced range of motion in his left hip. (*Id.* at 411.) Additionally, he opined that Plaintiff was not capable of any manual labor requiring walking, standing for long periods of time, squatting, stooping, or climbing. (*Id.*)

Two State Agency medical consultants completed Physical RFC Assessments based on Plaintiff's records prior to his hip replacement surgery. (*Id.* at 382, 413.) On May 24, 2006, Virginia Byrnes, M.D. found Plaintiff capable of sedentary work, with limitations of occasionally lifting ten pounds, frequently lifting less than ten pounds, standing and/or walking for at least two hours in an eight-hour workday (due to pain), sitting for about six hours in a workday, and limited pushing and pulling with the lower extremities. (*Id.* at 383.) She opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (*Id.* at 384.) Henry Astarjian, M.D. came to similar conclusions in his November 2, 2006 assessment; however, he opined that Plaintiff could lift no more than five pounds occasionally, stand and/or walk no more than four hours in a workday, and limited use of foot operated machinery with the left leg. (*Id.* at 414.) Dr. Astarjian felt Plaintiff could balance frequently, but added that he should avoid concentrated exposure to extreme cold, humidity, and vibration (which could aggravate his joint pain), as well as hazards such as machinery heights. (*Id.* at 417.)

On October 2, 2007, Dr. Kney reported benign physical exams of Plaintiff's lower back and knee. (*Id.* at 459.) He "encouraged [Plaintiff] to look for work in spite of ortho complaints," writing that Plaintiff might experience some pain "on and off for years to come" but it was not a reason for long-term disability. (*Id.*) On January 10, 2008, however, Dr. Kney opined that Plaintiff was currently unable to work because of orthopedic complaints, worsening chronic back pain, and IBS. (*Id.* at 464.)

On April 8, 2008, C. Nason Burden, M.D. performed a consultative orthopedic evaluation for Massachusetts DDS. (*Id.* at 465.) He observed Plaintiff's difficult gait and use of a cane for support and balance. (*Id.* at 467.) Dr. Burden opined that Plaintiff had a "fairly good result" from the hip replacement surgery, with forward flexion to about 60 degrees, but could bend to the right about 30 degrees and to the left only 10 degrees. (*Id.*) Dr. Burden diagnosed Postoperative State times two of disc syndrome at L4-L5, recovering; Postoperative State total left hip replacement, recovering; and Extensive osteoarthritis of both hips. (*Id.* at 468.) Dr. Burden opined that Plaintiff "merits consideration for disability." (*Id.*)

On June 4, 2006, Dr. Ober completed a Consultative Examination Report. (*Id.* at 391.) He opined that Plaintiff's prognosis for adjustment reaction and depressed mood was good with treatment and fair-to-good without treatment. (*Id.* at 394.) On June 29, 2006, State Agency psychologist, S. Fischer, Psy.D., reviewed Plaintiff's records and opined that he did not have a severe mental impairment. (*Id.* at 395.) He reported only mild restriction of Plaintiff's activities of daily living and difficulties maintaining concentration, persistence, or pace. (*Id.* at 406.)

### C. Administrative Hearing Testimony

On November 30, 2012, Plaintiff testified at the hearing before the ALJ. (R. 499.) Plaintiff was 38 years old at the time. (*Id.* at 503.) He stated, at the end of the relevant time

period, he lived in a condominium with his wife and approximately one year old child. (*Id.* at 504, 506.) He last worked in 2004 and was in pain from 2004 to 2009, mostly in his back and left leg. (*Id.* at 516-17.) Plaintiff testified he began using a cane in 2006. (*Id.*) Plaintiff also described suffering from IBS since 1993, and stated he would use the bathroom frequently. (*Id.* at 533.) Plaintiff testified that he drove two to three times per week during the relevant period to pick up medications or small items from a supermarket. (*Id.* at 507.) He also performed some household chores like light cooking, cleaning, and doing dishes with a dishwasher after moving in with his wife. (*Id.* at 521, 526.)

A vocational expert, Dr. Dana Levitton, also testified at the hearing. (*Id.* 528-29.) Dr. Levitton reported, based on the ALJ's hypothetical, that Plaintiff could perform 80% of 200 sedentary, unskilled jobs in the national economy, including taper for printed circuit boards or final assembler. (*Id.* at 531.) The ALJ's hypothetical assumed an individual of Plaintiff's age, education, work experience, and functional limitations, who could remain productive more than 85% of the time. (*Id.* at 529-531.)

### III.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether that decision was supported by substantial evidence in the record, and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). It is more than a mere scintilla, but less than a preponderance. *Id.* If the ALJ's determination is not supported by substantial

evidence in the record, or if the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In reviewing the record for substantial evidence, the court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. With this standard in mind, the Court evaluates the ALJ's findings and decision.

## IV.  ANALYSIS

### A. Determining Disability and the Sequential Analysis

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment or impairments that make it impossible to do past relevant work, or any other substantial gainful activity that exists in the national economy. *Id.*; *see Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine the claimant's eligibility. Specifically, the ALJ must consider whether the claimant: (1) is engaged in substantial gainful activity ("SGA");[1] (2) has a severe impairment; (3) has an

---

[1] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks, hobbies, therapy, school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairment that equals a condition contained within the SSA's official Listing of Impairments; (4) has an impairment that prevents past relevant work;[2] and (5) has an impairment that prevents him from any substantial gainful employment. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## B. ALJ's Findings

In accordance with the five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, the ALJ determined that Plaintiff had not engaged in SGA during the period from his alleged onset date, September 2, 2004, through the date last insured, December 31, 2009. (R. 488.) Next, the ALJ concluded that Plaintiff suffered from the following severe impairments: "lumbar disc disease, residual effects of a left hip replacement, degenerative joint disease of the left hip, adjustment reaction, osteoarthritis of both hips, and irritable bowel syndrome through the date last insured." (*Id.* at 488-89.) In evaluating the effect these impairments have on Plaintiff's functioning, the ALJ stated that "these impairments, singly and in combination, cause more than a minimal restriction in the [Plaintiff's] work-related abilities." (*Id.* at 489.) The ALJ did not find, however, that these impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) Fourth, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to:

> perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except that he required an assistive device to walk and stand, required the option to alternate between sitting and standing at intervals of 60 minutes, and could push or pull less than 10 pounds with his left lower extremity. He could occasionally climb stairs or ramps, balance, bend, stoop, kneel, crouch, or squat, but was unable to crawl or climb ladders, ropes, or scaffolds. He needed to avoid concentrated exposure to extreme cold, high humidity, vibration, and hazards . . . had limited ability to concentrate, maintain attention for extended periods, and keep up a pace, due to pain, fatigue, and the effects of medication, but his productivity would not have been decreased more than 15%.

---

[2] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1560(b), 404.1565(a).

(*Id.* at 490.) Fifth, while Plaintiff was unable to perform any past relevant work through the date last insured, the ALJ concluded that, considering his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could have performed. (*Id.* at 493-94.)

Therefore, the ALJ determined that Plaintiff was not under a disability at any time during the relevant time period, from the alleged onset date through the date last insured. (*Id.* at 495.)

## C. Cross-Motions for Summary Judgment

The Plaintiff raises three primary issues in this action: (1) whether the ALJ erred in his RFC analysis by improperly evaluating physician opinion evidence and concluding that Plaintiff could perform sedentary work with no more than a 15% loss in productivity; (2) whether the ALJ improperly evaluated Plaintiff's credibility and the record's consistency with Plaintiff's allegations of disabling symptoms; and (3) whether substantial evidence supports the ALJ's conclusion that Plaintiff's medical conditions did not meet the requirements of any Listing of Impairments. Defendant seeks summary judgment on the ground that the ALJ's decision is supported by substantial evidence and, therefore, should be affirmed. Defendant's briefing focuses on disputing the arguments propounded by Plaintiff. Therefore, the Court will address each of Plaintiff's objections to the ALJ's decision in turn.

### 1. Evaluation of Physician Opinion Evidence

Plaintiff contends the ALJ failed to give appropriate weight to opinions supporting disability from treating physician, Dr. Kney, and consultative examiner, Dr. Burden. (Dkt. 13 at 8; *see* Dkt. No. 20 at 3.) While the medical opinions of treating physicians are generally given controlling weight, the ALJ is not required to accept those opinions when they are not well-supported or are inconsistent with other substantial evidence in the record. *See* 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2); *Craig*, 76 F.3d at 590. "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in deciding the weight to be given to the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; (5) whether the physician is a specialist in the area in which he is rendering an opinion; and (6) any other relevant factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6). If a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *See Craig*, 76 F.3d at 590. Finally, the ALJ need only be specific enough to allow a reviewing court to determine the weight given to a medical source and the reasons for that weight. *See* SSR 96-2p.

### a. Dr. Kney

The ALJ declined to give two of Dr. Kney's opinions controlling weight because they were inconsistent with objective medical evidence in the record, as well as Dr. Kney's own revised opinions. (*See* R. 492.) In contrast with his May 5, 2006 opinion that Plaintiff could not work due to pain and limited left hip mobility, on September 29, 2006, Dr. Kney reported to Massachusetts DDS that Plaintiff was unable to perform manual labor or return to his job as a warehouse worker—not that he was precluded from all work. (*Id.* at 411.) The ALJ also specifically noted Plaintiff's improved functioning following left total hip surgery on March 21, 2007. (*Id.* at 492.) This was documented by Plaintiff's orthopedic surgeon, Dr. Mabie, who

observed Plaintiff walking well and moving his hip without difficulty or pain approximately one month after surgery. (*Id.* at 443-44.) Three months after surgery, Dr. Kney's physical exam showed no effusion, a full range of motion, and a return to a more normal gait pattern. (*Id.* at 447-48.) Additionally, no abnormality was seen in an MRI of Plaintiff's left knee. (*Id.* at 448-50.) These improvements are consistent with Dr. Kney's revised opinion from October 2, 2007, which the ALJ cites. (*Id.* at 492, 459.) At that time, Dr. Kney encouraged Plaintiff to look for work, noted benign back and left knee physical exams, and opined that he did not think Plaintiff's orthopedic problems would be a reason for long-term disability. (*Id.* at 459.)

The ALJ also gave little weight to Dr. Kney's January 10, 2008 opinion for similar reasons. (*Id.* at 492.) While Dr. Kney opined Plaintiff could not work because of orthopedic complaints, chronic back pain, and IBS, in the same letter he wrote that Plaintiff's symptoms did not suggest nerve root impingement in his back, and that recent imaging of his left knee and left hip were normal. (*Id.* at 464.) Additionally, although Plaintiff was referred to a pain specialist after lumbar imaging revealed ongoing degenerative disc disease, (*id.* at 580-81), his doctors observed normal gait patterns, the ability to heel and toe walk, and little to no pain in his hips. (*Id.* at 592, 597.) The ALJ also noted that Plaintiff's implanted spinal cord stimulator provided marked improvement in his pain and quality of life prior to the expiration of his date last insured. (*Id.* at 493.)

The ALJ must only give controlling weight to treating physicians if their opinions are not inconsistent with other substantial evidence in the record. Based on the ALJ's findings that two of Dr. Kney's opinions supporting disability were inconsistent with his own treatment notes and other evidence in the record, the ALJ had discretion to give these opinions less weight, regardless of Dr. Kney's status as a treating physician.

### b. Dr. Burden

The ALJ also declined to give controlling weight to Dr. Burden's opinion that Plaintiff merited consideration for disability because it was inconsistent with his own report that Plaintiff had good range of motion in his hips and could walk with a cane. (R. 493, 467.) Furthermore, because Dr. Burden only examined Plaintiff one time, his opinion as a non-treating physician was entitled to less than controlling weight. *Id.* at 465; *see* 20 C.F.R. § 404.1527(c)(1)-(2). Instead, the ALJ had the discretion to consider Dr. Burden's opinion as just one part of the record when assessing Plaintiff's RFC. *See* 20 C.F.R. § 404.1527(d)(1)-(2). Specifically, the ALJ referred to records from October and December 2008, where Plaintiff's doctors observed that he could heel and toe walk, had a normal straight-leg raise test bilaterally to 80 degrees, a normal gait, and little to no spinal pain on examination. (R. 597, 592.) As stated above, the spinal cord stimulator also improved Plaintiff's pain and ability to carry out daily activities. (*Id.* at 493.)

In sum, the ALJ correctly followed the treating physician rule in determining the weight to give to Dr. Kney and Dr. Burden's opinions. The ALJ need not list each factor in the regulations concerning weight so long as the "order indicates consideration of all the pertinent factors." *See Burch v. Apfel*, 9 F. App'x 255, 259-60 (4th Cir. 2001) (per curiam) (examining the ALJ's order and concluding it indicated proper consideration of the 20 C.F.R. § 404.1527(c) factors). This Court is persuaded that Plaintiff's entire record was considered and all the relevant factors for giving a treating physician's opinion less than controlling weight were evaluated. Regarding Dr. Kney in particular, the ALJ was clearly aware that he treated Plaintiff on a regular basis as his primary care physician given the ALJ's detailed examination of and frequent reference to Dr. Kney's treatment notes. The ALJ also stated he considered all of Plaintiff's symptoms and the extent to which they were reasonably consistent with the objective medical

evidence, opinion evidence, and other evidence in the record. (*Id.* at 490.) The ALJ noted persuasive contradictory evidence in the record, and documented the instances where Dr. Kney's treatment notes were inconsistent with this evidence, as well as other physician opinions which the ALJ gave great weight. (*Id.* at 492.) Thus, the Court finds no error in the ALJ's decision to afford Dr. Burden's April 2008 opinion and Dr. Kney's May 2006 and January 2008 opinions little weight. The ALJ sufficiently articulated the reasons for this determination, and his treatment of these opinions is in accord with the regulations and supported by substantial evidence in the record.

### 2. Plaintiff's Credibility

Plaintiff contends the ALJ also erred in evaluating his credibility and finding his allegations of disabling symptoms inconsistent with the record. (Dkt. No. 13 at 10, 12.) In assessing a claimant's subjective statements of pain or other symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p. At step one, the claimant must show that an underlying medically determinable impairment reasonably could produce the individual's alleged symptoms. *Craig*, 76 F.3d at 594-95; SSR 96-7p. If this threshold is met, at step two the ALJ will evaluate the intensity and persistence of the alleged pain or other symptoms, and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms, and must provide specific reasons for the weight given to the claimant's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p. While complaints of pain may not be rejected solely because the objective evidence does not substantiate the claimant's statements as to the severity and persistence of

pain, the statements need not be accepted to the extent they are inconsistent with the available evidence. *Craig*, 76 F.3d at 595; SSR 96-7p.

Additionally, this Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ concluded Plaintiff had only satisfied his burden at step one, finding "[a]fter careful consideration of the evidence . . . that claimant's medically-determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 491.) At step two, the ALJ determined the record was not entirely consistent with Plaintiff's statements regarding his alleged disabling symptoms. (*See id.*) Plaintiff reported, "and confirmed in his testimony at the hearing on remand" that, while he had bad days because of pain, he could prepare simple meals, do some household chores, care for his personal needs independently, and socialize with others. (*Id.* at 491, 211-213, 507.) In May 2009, Plaintiff also reported to his primary care physician that he was responsible for taking care of his 15 month old son for about eight hours per day. (*Id.* at 607.)

The ALJ also found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely credible when viewing the record as a whole. (*Id.* at

491.) The ALJ considered evidence from treating and non-treating physicians from throughout the relevant time period, in addition to Plaintiff's reported symptoms. The ALJ observed Plaintiff's responsiveness to treatment following surgeries for his herniated discs and hip osteoarthritis. (*See id.* at 491-92.) The ALJ also credited assessments by two State Agency consulting physicians who found Plaintiff's symptoms credible, (*id.* at 387, 418), and accounted for Plaintiff's limitations in their opinions that he was capable of sedentary work with certain restrictions. (*Id.* at 492.) While the ALJ acknowledged clinical evidence of degenerative changes to Plaintiff's spine and hip, he cited Dr. Mabie and Dr. Kney's treatment notes indicating benign left knee MRI and physical exams, and a successful left hip replacement that improved Plaintiff's gait, range of motion, and pain symptoms. (*Id.* at 459, 447-448.) Dr. Narang's notes from 2009 also describe marked improvement in Plaintiff's quality of life, and ability to exercise and carry out activities outside the home. (*Id.* at 621, 626.)

Finally, the ALJ's opinion did not wholly discount Plaintiff's complaints of pain, which were incorporated, in conjunction with other impairments, into the ALJ's assessment of his ability to perform other work. The ALJ's hypothetical to the VE accounted for pain, fatigue, and the side effects of medication on Plaintiff's concentration, attention, and pace. (*Id.* at 490.) The ALJ also included a limitation to Plaintiff's lower extremity consistent with his reported pain, despite benign X-rays and MRIs in the record. To the extent the ALJ did not pose limitations to the VE specifically including Plaintiff's IBS, the record indicates this impairment was partially responsive to Imodium and possibly pain medication, and Plaintiff's bouts of diarrhea reduced from two to three times per week in 2006, to one to two times per month in early 2010. (*Id.* at 453, 624.) It is well recognized that if treatment or medication can reasonably control a symptom, that symptom cannot serve as the basis for disability. *See Gross v. Heckler*, 785 F.2d

1163, 1166 (4th Cir. 1986); 20 C.F.R. §§ 404.1530, 416.930. Consequently, there was no error in the ALJ assessing a decrease in productivity of no more than 15%, given substantial evidence in the record supporting the ALJ's credibility determinations.

Thus, the ALJ performed the required *Craig* analysis and provided a clear rationale to support his determination that Plaintiff's allegations regarding the intensity, duration, and limiting effects of his symptoms were not entirely credible. The record indicates that the ALJ's opinion that Plaintiff was capable of limited sedentary work was based on a full review of Plaintiff's testimony, subjective complaints, and the medical evidence before him. Accordingly, the ALJ's conclusions regarding Plaintiff's credibility and RFC are based on substantial evidence in the record.

### 3. Listing Determination

Finally, Plaintiff argues the ALJ failed to consider that his impairments met the criteria of Musculoskeletal Listings 1.02A, Major Dysfunction of a Joint(s) (Due to Any Cause),[3] and 1.03, Reconstructive Surgery or Surgical Arthrodesis of a Major Weight-Bearing *Joint*.[4] (Dkt. No. 13 at 13-15.) The SSA's official Listing of Impairments identifies claimants whose impairments are considered severe enough to prevent them from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R., Pt. 404, Subpt. P.App. 1; 20 C.F.R. §§ 404.1525(a), 416.925(a). The claimant must present evidence of a medically determinable impairment that

---

[3] "1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . ." 20 C.F.R., Pt. 404, Subpt. P.App. 1.

[4] "1.03 Reconstructive surgery or surgical arthrodesis of a major weight- bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R., Pt. 404, Subpt. P.App. 1.

meets or is equal in severity and duration to all of the criteria of the relevant, or most similar, listed impairment. *See* 20 C.F.R. §§ 404.1525(c), 404.1526. If a claimant meets all of the criteria of any of the medical conditions set forth in the listings, the individual is considered disabled. *See* 20 C.F.R. § 404.1520(d). When assessing the case record regarding whether the impairment medically equals the severity of a listed impairment, allegations of pain or other symptoms are not a substitute for missing or deficient signs or laboratory findings. 20 C.F.R. § 404.1529(d)(3).

While the Fourth Circuit has held that an ALJ's opinion must identify relevant listed impairments and compare the criteria to evidence of the claimant's symptoms, *Cook v. Heckler*, 783 F.2d 1168, 1172-73 (4th Cir. 1986), subsequent unpublished decisions have clarified that this duty only arises where there is ample evidence in the record to support a determination that the claimant's impairment meets or equals a listing. *See Ketcher v. Apfel*, 68 F. Supp. 2d 629, 645-47 (D. Md. 1999). "*Cook* . . . does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Id.* at 645 (quoting *Russell v. Chater*, 60 F.3d 824, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished disposition)). Instead, where the ALJ adequately explains his evaluation of the claimant's impairments in a manner that is sufficiently comprehensive given evidence in the record, this analysis will suffice on review even without explicitly addressing a specific listing. *See Ketcher*, 68 F. Supp. 2d at 646 (noting a series of unpublished Fourth Circuit cases[5] "in which the ALJ did not specifically explain why he rejected certain listings, however, . . . their explanations were [deemed] sufficient given the evidence in the records.") (citations omitted).

Although ALJ Sturek did not specifically discuss Plaintiff's impairments with respect to listings 1.02A and 1.03, he was not required to because substantial evidence in the record

---

[5] *Russell*, 60 F.3d 824, 1995 WL 417576, at *3; *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. Aug. 14, 1995), and *Lyall v. Chater*, 60 F.3d 823, 1995 WL 417654, at *1 (4th Cir. July 6, 1995).

supports the conclusion that Plaintiff's impairments do not meet all the criteria of either listing.[6] The ALJ acknowledged that Plaintiff suffered from osteoarthritis of both hips and ongoing lower extremity symptoms; however, listings 1.02A and 1.03 also require the claimant to prove the "inability to ambulate effectively."[7] This is not reflected in the record.

The ALJ referenced Plaintiff's testimony demonstrating an ability to complete various ambulatory activities independently, including driving, cooking simple meals, and performing household chores. (R. 489, 521, 526.) Plaintiff also testified that he could climb steps using railings, had no problems using his hands, and could take groceries off the shelves while shopping. (*Id.* at 507, 519, 521.) Treatment notes spanning the relevant time period indicate that Plaintiff's doctors closely monitored his gait, range of motion, and pain levels in his lower extremities, but they make no mention of deficits to his upper extremities, even with the use of one cane for walking. (*See id.* at 516-17.) While a review of the record shows that Plaintiff initially used two canes immediately after hip surgery, approximately one month later, Dr. Mabie encouraged him to use one cane or crutch and pursue physical therapy. (*Id.* at 441.) Thus, to the extent Plaintiff demonstrated a brief period of ineffective ambulation within the meaning of the listings' criteria, there was not ample evidence that he met listing 1.02(A) and he still failed to satisfy listing 1.03's twelve-month durational requirement.

---

[6] Plaintiff does not dispute the ALJ's assessment of his impairments with regard to Listing 12.04 Affective Disorders. (*See* Dkt. No. 13 at 13-15.)

[7] "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b). Examples of ineffective ambulation include the inability to: walk without a walker, two crutches, or two canes; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; and, carry out routine ambulatory activities such as shopping and banking. *Id.*

Plaintiff must show that his impairment meets or medically equals "*all* of the specified medical criteria" of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*; SSR 91-7c. Accordingly, the Court finds no error in the ALJ's determination that Plaintiff did not meet a listing at step three of the sequential analysis.

This Court's role is not to weigh the conflicting evidence or substitute its judgment for that of the ALJ. Based on a thorough review of the record and the ALJ's decision, this Court finds the ALJ correctly followed the treating physician rule in evaluating the proper weight to be given to Dr. Kney and Dr. Burden's opinions. The ALJ sufficiently articulated the proper weight given to Plaintiff's testimony and analysis of Plaintiff's symptoms, and there was no error in the ALJ's credibility determinations. Additionally, the Court finds no error in the ALJ's determination that Plaintiff did not meet a listing. Thus, this Court concludes that the ALJ's decision is supported by substantial evidence, and summary judgment should be granted in favor of Defendant.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence and does not contain legal error. Therefore, the Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment by Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security, shall be GRANTED, and the Motion for Summary Judgment by Plaintiff, Richard J. Hamm, Jr., shall be DENIED. An appropriate Order will follow.

/s/

Ivan D. Davis
United States Magistrate Judge

January 12, 2015
Alexandria, Virginia